You may proceed. Your Honors, and may it please the Court, Andrew Grimm of the Digital Justice Foundation, appearing in lieu of Attorney Gregory Keenan. On behalf of Appellants, I'd like to request three minutes for rebuttal, if I may. All right, you'll need to watch your time and reserve it. Thank you, Your Honor. Fair use isn't a question of whether or not we think the use is good or bad in some sense of what, but rather it's a question of whether it's fair to permit the specific use in question without paying the rights holder anything or attempting to do so. And my clients here are asking for a very narrow reversal that hinges on a critical fact that is entirely ignored in the briefing of both the other side and in their amicus. And that's because appellees ignore a crucial fact. Defendants left the floor plans up well after the homes were no longer listed for sale, seven years in the Horak case. Neither appellees, nor their amicus, nor the District Court acknowledge this point, that the infringing floor plans stayed up well after they're no longer listed for sale. And so when Mr. James found out about the infringing floor plans being unlike, online, he contacted them through his attorney. And defendants still refused to take them down. So they didn't take them down. There was no attribution to Mr. James or DesignWork Homes through which an interested member of the public could have located him. And they didn't offer him any money. The roughly $1,500 of reasonable royalty that they had paid in the HOB case to a third party, no portion of that was offered to him, making this a relatively small claim, but a large issue for a working artist whose central designs are at stake. I'm trying to figure something out here. Are you arguing here that this narrow ruling could be as simple as there's no longer fair use of this plan because after the property was sold and closed on, the plan remained and that we would not have to reach the issue of fair use at all as to the original use of the plan and we could limit it simply to the failure to take it down? Yes, Your Honor, that's exactly right. My reading of the case law is that's actually what Warhol instructs courts to do to rule narrowly. Because on the one hand, if you rule really broadly that something's a fair use, you destroy an entire copyrighted market. So our amicus talks about how this is a well-established market for licensing plans. Is there no evidence, though, I think, that your client has ever exported or tried to export that market? Isn't that true? Well, Your Honor, he certainly has tried to do so. And there is evidence in the record of a market for this, and that's specifically when we, in the House of Brokers case, when you see there's a third-party company that actually they paid roughly $1,500 to produce the plan. You're asking us to construct a market for these particular plans out of some evidence that some other kind of copyrighted material had a secondary market? Well, yes. So three points, Your Honor. So the first is, as the Supreme Court has said time and time again, on the fourth factor, this is an affirmative defense. And, in fact, in the Campbell decision, they even remanded to discuss market use. As Campbell itself said, quote, it is impossible to deal with the fourth factor except by recognizing that a silent record on an important factor bearing on fair use disentitled the proponent of the defense to summary judgment. The evidentiary whole will doubtless be plugged on remand. That's Campbell at 594. So to the extent that you think the record does not demonstrate the market factors here, Your Honor, that would be a basis to do a remand. But, again, I don't think we have to address the broader question, but because the broader question of use, in particular for a sale, because they left it on for years after and refused, in response to Mr. James' request, to attribute him to pay him anything or take it down. So I think that, to my mind at least, the most important question is, in these kinds of cases, and perhaps particularly in this one, is the effect that this use had on markets. And so can you summarize your argument with respect to that point? What markets were affected? To whom did they belong and why did they belong to your client? Sure, Your Honor. So, first, again, I would say, if you don't think the record establishes that, the Campbell decision court I just read shows they have not met their burden on the affirmative defense here. But the second point is- Well, forget about that for a moment. Just give me- What? If you realize it. Let's pass over that point for just a moment. Okay. All right. Sure. So because they left it online well after they're no longer attempting the sale, this is a market for online display in general. So this isn't directly related. And I would say it's an advertising market. So the Campbell decision, this court's 2024, I think, Griner decision, talk about the advertising use. Campbell expressly says if you shift towards an advertising use, that inherently shows that there's a market for it. And that strongly weighs against fair use. So here what they're doing, at first when they're marketing it for the sale of the home, that's a specific type of advertisement. When they leave it up afterward, that's marketing and advertising for their specific website. Would it have a benefit for your client, too, though? Well, no, because his name isn't on it. So Warhol also talks about that. So in their brief they talk about, well, it could benefit- I mean, in terms of future sales. Well, again, no, because he doesn't actually get any of the proceeds of the sale of the house. And there's nothing in this record- Other houses. Sorry, what? Other houses that might be built. There's nothing connecting him to this specific floor plan. So his brand isn't being increased. And that's one thing Warhol talked about. So when Lynn Goldsmith and Warhol, when she licenses her work, she licenses it. So that you can bring it back to- You can say, okay, I like this art or I like this architecture. I'll go find Lynn Goldsmith. So I think that would be a very good argument, but they didn't do that. They didn't do that either when they initially did it or after Mr. James contacts them. They don't update it to say, you know, Design Works Homes, Charles James, so that he can get some of the credit for that. And that goes to your point about we have an advertising market and it doesn't promote it. So I think in a situation where they are clear that this is the architect, I think at that point they have a stronger case. But here they didn't do that even after trial counsel, before he reached out to them regarding the situation. And they didn't do anything to change that. It remained as was. Now, when you made the argument that by keeping this up that they really were just advertising their own website, do you believe that's really accurate? I mean, experience tells me that from time to time people will approach both realtors, real estate agents, and homeowners. Just knock on the door and say, if you're ever going to sell your house, I want to buy your house. And by having this up seven years after the sale took place, isn't it really an invitation for someone who's just sort of browsing through to contact one of the MLS companies and say, hey, this house used to be listed and it was sold seven years ago. I really love that house. I'd like to buy that house today, tomorrow, ten years from now. It doesn't matter to me. Would you be willing to approach them, first of all, to see if they want to sell that house, or B, if they would keep my information in the event they decide to sell it later? I mean, because, you know, there are houses, and particularly houses like this one, which you claim has sort of a unique feature, that happens. So I think those are good points, Judge Erickson, but I think that there is social value of posting it. But the fair use question isn't, is this a socially valuable use in some way? The fair use question is, should we cut the rights holder out entirely? So we're not asking, do we want a world where this can happen? A second point I'd make is, well, the realtors, they're not trying to restrict the use in any way to interested homeowners. So if Ms. Horak and HOB had limited the use, let's say, to they have a list of people who are looking for homes and sent that out, that's a very different situation. As our amicus point out, people go online, they'll steal your floor plans and construct it, and they give an example where that happens, and they'll attach their name on it. And so these works, he had never publicly released these. He built a couple of the homes, but he hadn't put these online. And so that goes to the second factor, which is degree of publication. How public did you make this, right? So there's the formal definition of publication. It wasn't published in that sense. But there's also the important question here of, well, how public did he make these? And he never put what his most important life work. Also, we can think how unique it is. How many homes have you been in that have a triangular-shaped room? And that goes to, this is not just some cookie-cutter home. This is his life's work, and it's central. The thing I would go to, I'll cover just briefly on the first factor, is they call this transformative, but it's plainly not under Warhol. Warhol uses a targeting test. So transformative requires commentary on the work itself. All they did is create what's called a derivative work, and that was a central concern in Warhol, which is the derivative right not being a, quote, dead letter. So the artist, when they make the architectural work, which is the design of a home, and then they have the derivative rights. Well, it was transformative in the sense that it was created for a different purpose, right? That's right. But it wasn't a substitute. But that's right. But if you take, for example, J.K. Rowling wrote her novels, and then they made eight movies out of them. She didn't write them for the purpose of a movie. They're a derivative. So what Warhol says very clearly is you have to have targeting. And I can give you some quotes, Your Honor, on that. So they talk about that here, the, let's see here. So, more generally, when commentary has no critical bearing on the substance or style of the original composition, and they're not talking about the substance or style or compting on the home, the claim to fairness and barring from other works diminishes accordingly if it does not vanish and other factors like extent of its commerciality loom larger. That's Warhol at 508. So what that goes to is it's not that they have their justification for putting it up in the first place. So they have to give a justification. Their justification is going to be they're trying to sell the home. But here they left it up in the Horrocks case seven years later. And if they want to do that for marketing or advertising or they think that's socially beneficial, that's certainly enough time to go and find the rights holder and see if they want that offer reasonable license. So if the use here had been limited to handing out paper copies of the floor plan at open houses, let's say, or even advertising in the newspaper with, you know, with the for sale ad, would that be? Well, I think handing them out at an open house, absolutely, because they're restricted to people who are interested in buying the home. In the newspaper, I guess the question there is, you know, that's a very strong claim for fair use if they're talking about it. What's going on here, though, is pure advertising and marketing. And that's, you go to Campbell. Campbell says, even if it's transformative, even if it's a transformative parody, it's still not necessarily a fair use if you're using it for advertising and marketing. And this court actually referenced that quote in its Greiner decision. Seeing no further questions, I'll reserve my time for rebuttal. Thank you, Your Honors. Mr. Keele? Yes. Good morning, Your Honors. May it please the Court. The floor plans at issue in this case are a fair use because they were created for a separate and distinct purpose. And according to Warhol, a use with a distinct purpose is justified because it furthers the goal of the Copyright Act, which is to promote the progress of arts and science without diminishing an incentive to create. In this case, the creation of the floor plans did not affect the market for DesignWorks designs in any way. Critically, there were no disputed issues of fact in this case, and the District Court granted summary judgment, which was appropriate. The other issue on appeal, which wasn't mentioned yet, the District Court did not abuse its discretion in denying the reopening of Discovery, and the Court should affirm on both rulings. The appellants talked about the time frame in which the floor plans were posted online. And in our view, and the view under the law, the amount of time posted is irrelevant to this analysis. Once a work is created and it's deemed to be fair, it's fair forever. There's not a single case cited that suggests it's only fair for a certain amount of time. There's no evidence in the record that the real estate agents could have taken down something that's been published on the Internet. Once it's on the Internet, it lives whether or not there was an attempt to take it down, and there's no evidence either way on that point. In turning to the relevant markets, there are several suggested by the appellants, but the obvious market is the market for these homes with this triangular feature. There's no evidence in the record that the creation of floor plans adversely impacted that market. None whatsoever. The record is not disputed that the appellees did not sell any floor plans. They did not duplicate any structures. No structures were built from the floor plans they created. The appellees did not draft any architectural drawings that could be used to create an infringing copyrighted 3D structure. As the district court found, much more expertise would be needed to create a 3D structure from these floor plans. It's undisputed in the record that the appellees did not have access to the DesignWorks architectural drawings. So the appellees went in, measured the rooms, created their own floor plans from the 3D structures themselves. Counsel, did the district court err in shifting the burden to DesignWorks to show market harm? No, and I don't think the district court did shift the burden. Shouldn't that have been part of the affirmative defense to demonstrate by the defendants, to demonstrate the lack of dispute as to market harm? Well, yes, market harm is one of the four factors of the affirmative defense of fair use. And the defendants did meet its burden in proving fair use by demonstrating each of those factors. And as to the effect on market harm, or the potential harm to the markets of the copyright holder, the district court found that the appellees did not sell any floor plans. And they didn't create any duplicating structures. And that no structure was built from the floor plans. And that the appellees did not draft any architectural drawings. Those factual findings support the conclusion that there's no effect on the market for the copyright holder. And the other thing I wanted to ask, is there significance in the fact that as when the floor plans were placed online or otherwise distributed or advertised, there was no attribution given to the designer? Would that be maybe something that would be expected in a kind of a simple step that could help avoid this kind of dispute? Perhaps it could be done, but it's not required. And in this case, under the undisputed facts, the copyright was not registered until after the alleged infringement. So the copyright was registered in 2018. So one house was listed in 2010, the other in 2017. Without any copyright registration, there's no way to know that Mr. James created these homes in 1996 and 1999. And they're for sale by a different owner many years later. There's no copyright registration. So there's no way for the real estate agents to come in and determine who created this home or that it was even claimed to be copyright protected, and then make the subsequent step of attributing the floor plan to that particular home builder. But there's also nothing in the law that requires that. Again, going back to the four fair use factors, the floor plans are clearly used for a different purpose than the 3D structure itself and the architectural drawings. The floor plans were used to inform the public as to the shape and design of the home, so as to three bedrooms, two baths, a garage, or whatever, and the layout. The market was not harmed for the copyright holder. And on balance, those fair use factors point to a fair use. A couple of things I want to address that were pointed out in the appellant's brief. He refers to this design as award winning. There's absolutely no evidence in the record that this home has won any awards. The appellant claims that the district court made inferences in favor of the defendants in ruling on summary judgment, but they don't identify any. And I've been unable to determine any inferences that were made in favor of the defendants in the granting of summary judgment. The author's guilt case versus Google is, I think, analogous and instructive. In that case, Google duplicated libraries worth of books and posted them, available to be searched, but not the actual text, but you could search for certain keywords and it would come back as to how many books, whatever word was found. And fair use was a question in that case. And the court found that Google was merely providing information about the copyrighted works. And that was a fair use. And that's exactly what these four plans are doing in this case. They're providing information to prospective purchasers about the copyrighted work, which is the home itself. And in that case, the court said, we have no doubt that the purpose of this copying is transformative, as described, as that word is described in Campbell v. Acuff-Rose, and that finding leans strongly towards fair use. Seeing no more questions. Thank you. Thank you, counsel. Mr. Lucas. Good morning, Your Honor. It's Vincent Lucas for Amicus National Association of Realtors. I'd like to start off, which I think all of us would like to start off with,  on the heart of the fair use inquiry here, as Judge Arnold has identified. And that's really, what are market effects? And I think my friend on the other side has essentially pointed to two potential markets. The first is, I think, the market for building homes, for using these floor plans to construct homes. And I think there, it's very clear that this is a transformative use, and that you're not going to be able to build homes from these floor plans. And I would just point you to pages 7 through 9 of my friend's brief on the other side. And I think you take a look at these very basic floor plans. And they're not the kind that an architect would use to construct a home, writing down on Mylar film or something along those lines. Basically, they're very simple. And the reason for that, and this is common in many online home listings that real estate agents put up, is because to put up an actual architectural plan would overwhelm the average home buyer. What they're looking for, what they're expecting, is they want to get the layout of the house. They want to see whether the furniture is going to fit, where the rooms are. They're not looking for ways of finding how to build a new home of their own. So I don't think this market is really any, has any bearing on what the harm here. Instead, I take my friend on the other side to be focusing more on a potential harm for licensing. And again, I think this does implicate the circularity problem that often appears in these sorts of fair use cases, where the plaintiff will come in and say, well, look, you cut me out of this. There's a potential market for licensing. I should get paid. And courts have always said, look, you can always say that in a fair use case, right? There's always a potential market for licensing. That can't be the way we resolve these issues. And so I think here, the way it's easy, the easiest way of doing this, is there's no evidence that DesignWorks had any interest in this sort of market or licensing for plans more generally. Now, I know my friend on the other side has talked a lot about the affirmative burden of the brokers and what they were supposed to provide. And I do think in this context, I'll leave it to the Brokers Council and how he's described that. Look, they did put on evidence. It was just undisputed. Below, DesignWorks didn't dispute any of the statement of facts. And so they did carry their burden. But I do want to underscore that just more generally, Your Honors, that these sorts of cases, it's not always that you have to go to trial on a fair use defense. And I point you to the Swatch case from the Second Circuit that the district court cited. And there, the plaintiff, the district court denied the claims. It gave summary judgment ruling on fair use. The plaintiff there came up and appealed and said, look, I was denied even an opportunity to engage in discovery. I want to engage in discovery of the markets for licensing this particular use. And the Second Circuit said, no, this is just purely hypothetical. And we don't think there's any credible case here to be made of going back and engaging discovery that you would actually have a licensing. Counsel, let me get your take on this. Wasn't there a point in time that was reached at which the distribution of the floor plans were no longer necessary or helpful to the marketing of the houses? So, Your Honor, this is the point. Namely, when the houses were sold. Right. So this is the point that my friend makes about, oh, well, you just should have taken them down after it was over. And I think it's at least two responses. First, I'm unaware, at least of any case bearing on this, saying that, oh, as soon as you sell something with an otherwise fair use, then the use automatically becomes unfair over time. And I think a good analogy here is, let's take the Nunes case out of the First Circuit, which is the one where there was a dispute whether you could use a photograph, a modeling photograph, put it in the newspapers. And I think all the time there will be a news story, right, and there might be a dispute over whether the original breaking of the news or the use of a photograph is fair use. News stories are put up online and are kept up online all the time. And that doesn't undercut the fair use level of that. The other thing I would just underscore, Your Honor, is that if you go online and take a look at home listings, especially if they have been sold at any time, they're usually up for much longer, for years after the home is sold. And they include also photos of the homes. And that's a sort of mainstream use of and a mainstream feature of real estate listings. And so I think my friend's position on the other side could really jeopardize a lot about the real estate industry. And it really underscores the issues here and the magnitude of the problems that would come with reversing the district court and granting fair use. And finally, I just want to underscore that licensing, this sort of hypothetical market for licensing over here that my friend has posited, is highly impractical. Because unlike many other contexts of fair use and copyright, you can't just simply track down an architect often. I mean, usually architects have created the homes long ago. Homes can be around for decades, if not hundreds of years. And it can be very hard to track down the architect. And the copyright office isn't going to provide a solution. As this case well shows, right, as my friend on the other side, his tactics of what happened with his client is after he saw the homes, then he registered the copyright. So there's not going to be an easy way for brokers or real estate agents, or frankly homeowners, to figure out even who the copyright holder is here. And even if there was, I think it's just important to underscore that you shouldn't have to pay for the privilege of being able to effectively sell your home in today's online real estate market. And that the consequences of eliminating this beneficial and fair use, which again serves as a compliment to rather than a substitute for the original architectural use of the copyrighted material, would be profoundly disruptive and disabling to the public. And so for that reason, Your Honor, I urge you to refer. Thank you. Thank you, counsel. All right, you may respond. Your Honor, there's a few points. First, nothing of what my friends on the other side said explained why after Mr. James contacted them, they couldn't have added attribution, take it down, or offered him a reasonable royalty. They haven't engaged that. The Appellee's counsel said that once the fair use is made, all uses are the same. That directly contradicts Warhol, which says, yet the dissent assumes that any and all uses of an original work entail the same first factor analysis based solely on the content of the secondary work. This assumption contradicts the fair use statute. That's at 508. The second issue here is Appellee's counsel. Counsel, can I ask this question? Where is a dispute of fact in this case? Well, one dispute of fact is whether or not it's buildable, especially with the context of the photos. There are a bunch of photos. The photos aren't an issue. He doesn't suit about them, but when you put the floor plan with the photos, it is buildable. Is that the only dispute of material fact? I also think, I mean, there's a number of them. On the second factor, he says this is, they used Inverness' decision, which was building off of, like, log cabin buildings, to then say that all architectural works are narrow in scope. So the way the district court reads Inverness, falling water would be narrow in scope and in protection. I mean, one thing is there's no evidence they presented as to markets whatsoever. So there's no dispute onto that, and the nature of the use is there. Could I continue through my points, Your Honor? Briefly. Okay. They mention that the market is only the sale of the home. Harper says the Fair Use Inquiry must take account not only of the harm to the original, but also the harm to the market for derivative works. That's Harper and Rose Supreme Court, U.S., 471 U.S. at 539. They discuss attribution and practical difficulties that wouldn't have been difficult after Mr. James himself presented himself and identified who he was and asked for the attribution. As to the Authors Guild, in Google there, they offered attribution, they offered links to go buy books, and they only used tiny snippets of it, not the entire design of the home. We respectfully request that you reverse on the narrow grounds and allow Mr. James to proceed and seek a reasonable royalty of around $1,500 rather than to face roughly $300,000 in attorney fees against him. That would destroy him. Thank you. All right, counsel. Thank you for your arguments. The case is submitted. Court will render a decision as soon as possible. And with that, counsel, you may stand aside. Please call our next case.